**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Pamela S. Songer, | ) | C/A No. 3:09-1743-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the magistrate judge's report and

recommendation that this court affirm the decision of the Commissioner denying

plaintiff's application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. The record includes a report and recommendation of

the United States magistrate judge made in accordance with 28 U.S.C. § 636(b)(1)(B).

Plaintiff has filed written objections to the report and recommendation. For the reasons

set forth below, the court adopts the report and recommendation of the magistrate judge

and affirms the Commissioner's decision denying plaintiff's application for DIB.

## I. BACKGROUND

### A. Procedural History

Plaintiff protectively filed for DIB on October 5, 2005.[1] Tr. 158. She

subsequently completed her application on October 19, 2005, alleging disability as a

---

[1]The court notes that plaintiff previously filed applications for DIB in June 2000
and December 2001; both of these applications were denied. Tr. 43-60.

result of fibromyalgia, depression, chronic pain syndrome, and degenerative disc disease. Tr. 140. Plaintiff identified September 25, 2004, as the disability onset date. Tr. 121. The Social Security Administration denied plaintiff's application on April 5, 2006 (Tr. 67-70), and on reconsideration (Tr. 73-76). Plaintiff requested an administrative hearing, which was held on January 16, 2008. Tr. 24. The administrative law judge (ALJ) issued her decision on March 20, 2008, finding plaintiff not disabled because she could perform jobs that exist in significant numbers in the national economy. Specifically, the ALJ found:

1.  The claimant met the insured status requirements of the Social Security Act through March 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since September 25, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia, arthritis, and depression (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to stand, sit, and walk six hours each in an eight-hour workday with the option of sitting or standing at her own will; to frequently lift and carry 10 pounds with a heaviest weight lifted occasionally of 20 pounds; to frequently bend and stoop; and to perform unskilled work not requiring frequent public interaction; not requiring work at heights or around dangerous moving machinery; and not requiring more than occasional stooping, kneeling, crouching, squatting, crawling, or bending.

[6.] The claimant is unable to perform any past relevant work (20 CFR 404.1565).

[7.]     The claimant was born on March 25, 1955 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

[8.]     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

[9.]     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

[10.]    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

[11.]    The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2004 through March 31, 2007, the date last insured (20 CFR 404.1520(g)).

Tr. 11-19.

On May 20, 2009, the Appeals Council denied plaintiff's request for review, rendering the Commissioner's decision final. Tr. 1-5. Plaintiff then filed this action for judicial review, raising the following assertions of error:

1.     THE ALJ'S DECISION WAS NOT BASED ON SUBSTANTIAL EVIDENCE;

2.     THE ALJ DID NOT CONDUCT A PROPER LISTING ANALYSIS; AND

3.     THE ALJ ERRONEOUSLY REJECTED OPINION EVIDENCE.

Pl.'s Br. 1. The magistrate judge rejected plaintiff's arguments and recommended that the Commissioner's decision denying plaintiff disability benefits be affirmed. Plaintiff filed specific objections to the magistrate judge's findings. Plaintiff objects to the

magistrate judge's (1) findings regarding the severity of plaintiff's impairments; (2) approval of the "ALJ's failure to perform a listing analysis for Listing 14.09"; (3) failure to properly consider plaintiff's combined impairments; and (4) rejection of plaintiff's treating physicians' opinions. This court will review these objections de novo.

### B. Plaintiff's History

Plaintiff was born on March 25, 1955. Tr. 28. Plaintiff testified that she is a college graduate. Tr. 28. From June 1989 to September 1999, plaintiff worked as a department store manager, overseeing a staff of approximately 250-300 employees. Tr. 141. From November 2000 to October 2001, plaintiff worked as a service administrator at a car dealership. Tr. 141. Her last job was in visual merchandise sales at a garden sales company from November 2001 to March 2002. Tr. 141. The record reflects that plaintiff stopped working for her last employer as a result of her alleged disability. Tr. 140-41.

Records provided by Dr. Lori Ayers, M.D., Carolinas Medical Group, during the period of October 2004 through October 2005 indicate that plaintiff was treated for a variety of maladies: fibromyalgia, sleep disorder, tobacco abuse, depression, hyperlipidemia, obesity, osteoporosis, lateral malleoral swelling, trauma/bruising to right approximately 10th rib, probable L4-5 disc radiculopathy with disc irritation, degenerative disc disease, and gastroesophageal reflux disease (GERD). Tr. 198-219. On October 27, 2004, Dr. Ayers reported that plaintiff's fibromyalgia was under "suboptimal control" because she was "not really exercising and watching her weight." Tr. 217. In December 2004, plaintiff's vital signs and extremities were functioning within normal

limits, with the exception that plaintiff experienced tenderness in the lower lumbar spine, on the right side. However, she had full range of motion in her back. Tr. 214.

On January 10, 2005, plaintiff reported that she had decreased myalgias, arthralgias, and fatigue. Plaintiff said she was sleeping through the night. Dr. Ayers also noted that plaintiff's depression had "markedly improved on current regimen." Tr. 213. In March 2005, Dr. Ayers wrote that plaintiff had lost weight, that she "feels overall much better," and that she had no real complaints during that visit. Tr. 212. In May 2005, plaintiff reported to Dr. Ayers that she fell, and as a result, she had tenderness over the right approximately 10th rib, at the costochondral junction; she also had swelling over the anterior and posterior lateral malleolar areas of her right ankle. Tr. 211. Dr. Ayers noted that her obesity was markedly improved—plaintiff decreased in weight from 170 pounds to 143.8 pounds. Tr. 211.

In June 2005, Dr. Ayers reported that plaintiff was doing well, overall; her mood was better; her fibromyalgia was stable; and her obsesity continued to show marked improvement. Tr. 210. On August 16, 2005, plaintiff had no complaints, felt better overall, and was in a good mood. At the time, she was considering moving from Charlotte, North Carolina, to Charleston, South Carolina. Tr. 209. On September 15, 2005, after presenting at an Urgent Care on August 30, 2005, plaintiff visited Dr. Ayers, complaining of lower back pain and pain to the hamstring area. Tr. 207. According to the report, plaintiff "had been doing some heavy lifting and water skiing, had driven also from Charleston back and forth and had pain associated with this." Tr. 207. Urgent Care gave plaintiff Depo-Medrol for pain and suggested that she use heating pads and non-

steroids. Tr. 207. Plaintiff's vitals were normal during plaintiff's visit with Dr. Ayers; however, Dr. Ayers noted "some point tenderness in L4-5 area midline as well as in the right gluteal area." Tr. 207. A straight leg test was positive on the right and negative on the left, and her lower extremities reflexes and strength were intact. Tr. 207. Dr. Ayers referred plaintiff to physical therapy for the L4-5 issue and referred plaintiff for an MRI. Tr. 207.

On September 17, 2005, an MRI of plaintiff's lumbar spine showed degenerative disc changes in L3-4; degenerative disc disease in L4-5; and degenerative disc disease in L5-S1. Tr. 204. The MRI showed, "[a] right paracentral disc extrusion L5-S1 tracking significantly inferior to the disc level into the right lateral recess abutting and probably mildly displacing the right S1 nerve root laterally as well as likely mildly displacing the right S2 nerve root as it exits the thecal sac." Tr. 204. In addition, the MRI showed "a very small central right paracentral disc protrusion L4-5 without definite focal neural compression," and "[f]acet degenerative changes L4-5 and L5-S1 with mild L3-4 degenerative disc disease as well." Tr. 204-05. On October 11, 2005, plaintiff reported radicular symptoms down the right leg, and she told Dr. Ayers that after undergoing physical therapy and steroid treatments, she still had "signficant back discomfort." Tr. 199. She also reported significant pain in the right gluteal, lower exremity. Tr. 199. Plaintiff told Dr. Ayers that she was seeing a neurosurgeon, who discussed possible neurosurgery with plaintiff. Tr. 199. Dr. Ayers's report notes that plaintiff's fibromyalgia was "under outstanding control with change to Cymbalta," and plaintiff had lost a lot of weight and had been feeling well. Tr. 199.

Physicians at OrthoCarolina treated plaintiff during the period of August 30, 2005, to September 13, 2005.  Tr. 181-86.  On August 30, 2005, plaintiff complained of right leg pain.  She said that the pain began approximately one week earlier in her right posterior thigh.  She said that it hurt to walk initially, but "she feels better with gradual increase in activity."  Tr. 186.  Dr. James Pressly, M.D., noted that plaintiff's gait was "mildly antalgic.  There is some tenderness over the right hamstrings posteriorly just at the gluteal crease and also at the mid portion of the muscle.  There is pain with extension of her knee when she is sitting but no real pain with flexion of the knee against resistance."  Tr. 186.  Dr. Pressly noted that plaintiff's hip and spine range of motion were "good without significant discomfort."  Tr. 186.  Dr. Pressly prescribed Voltaren and Darvocet, along with rest and the use of heat.  Dr. Pressly was unsure of the causes of plaintiff's pain.  Tr. 186.

On September 7, 2005, plaintiff saw Dr. John Ternes, M.D., at OrthoCarolina.  Tr. 184.  As in her earlier visit with Dr. Pressly, plaintiff complained of posterior right thigh pain that she had experienced for approximately one month.  Dr. Ternes noted in plaintiff's history that she had no prior history of "any similar pain or discomfort."  Tr. 184.  He also noted that the discomfort experience by plaintiff was of "variable severity." Tr. 184.  In addition to the thigh pain, plaintiff also informed Dr. Ternes of "a mild low lumbar central aching."  Tr. 184.  She said that the pain in her right buttock area radiated down to her right mid-thigh, and that the pain is "stabbing, throbbing and constant."  Tr. 184.  She also mentioned some tingling sensations in her right calf and foot.  Plaintiff told Dr. Ternes that she felt like the condition was getting worse and that "[l]ifting,

7

twisting, lying in bed, kneeling and sitting increase her discomfort." Tr. 184. Upon physical examination, the doctor found that plaintiff's back was "straight with no warmth, swelling, erythema or skin lesions." Tr. 184. She walked with a normal gait, had minimal tenderness on the right low lumbar paraspinous muscles, and no SI joint or greater trochanteric tenderness. Tr. 184. The doctor did find tenderness upon touching her right sciatic notch. Tr. 184. Plaintiff demonstrated a back range of motion by touching her fingertips to mid-leg and showing extension to twenty degrees. She had mild right thigh discomfort when she bent forward. Plaintiff's bilateral lower extremity strength was 5/5; reflexes were 2+; and sensation was intact to light touch. Tr. 184. Dr. Ternes found that the "[s]traight leg raise, tripod and bowstring tests [were] negative bilaterally." Tr. 184. Dr. Ternes documented that x-rays of plaintiff's lumbar spine show "slight disc space narrowing at the L4-5 and L5-S1 levels," along with "some slight facet arthrosis." Tr. 184. Dr. Ternes assessed that plaintiff suffered from right sciatica and recommended placing plaintiff on a Medrol Dosepak; he also suggested exercises that might help her back. Tr. 185. Notably, plaintiff never complained of any pain in her left lower back, or in her left leg.

Plaintiff continued to have right buttock/right posterior thigh pain when she visited OrthoCarolina again on September 13, 2005. Tr. 181. She complained of numbness and tingling radiating into her right foot. Tr. 181. She told Dr. Ternes that the Medrol did not help, and the Demerol helped only slightly. Dr. Ternes described plaintiff as alert and not in acute distress. Her mood was normal, and she walked with a normal gait. Tr. 181. She had some tenderness in her lower lumbar paraspinous muscles, as well

as mild right sciatic notch tenderness.  Her back range of motion was demonstrated by touching her fingertips to her knees and extension to thirty degrees, both of which caused discomfort in plaintiff's right buttock and posterior thigh.  Tr. 181.  Her bilateral lower extremity strength was 5/5, reflexes +2 in the knees and ankles, and "sensation subjectively decreased to light touch at the right L5 distribution."  Tr. 181.  The straight leg raise, tripod and bowstring tests caused some discomfort in the right buttock, "but no clear radicular discomfort."  Tr. 181.  Dr. Ternes assessed plaintiff as having right sciatica versus L5 neuropathy and recommended that she get an MRI of the lumbar spine and follow up with the spine center.  Tr. 181.

Plaintiff underwent physical therapy at the Carolinas Physical Therapy Network from September 22, 2005, to October 10, 2005.  Tr. 187-97.  She informed the physical therapists that she had only received temporary relief from pain in her right buttock and thigh as a result of the physical therapy.  Tr. 187.  Plaintiff's discharge therapy report reflects that she planned to have lumbar surgery in the near future.  Tr. 187.

Plaintiff was treated at Carolina Neurosurgery & Spine from September 29, 2005, to January 10, 2006.  Tr. 220-27.  On September 29, 2005, plaintiff presented with right-sided sciatica in the proximal posterior thigh.  Tr. 223.  She stated that walking or lying down made it feel better, but sitting made the condition worse.  She stated that she had used a couple of Prednisone Dosepaks and was taking Voltaren, and these drugs helped with the pain somewhat, but she still had symptoms.  Tr. 223.  Plaintiff reported that she did not have "much in the way of back pain," but she did have some right buttock and posterior thigh pain.  Tr. 223.  A sitting straight leg test on September 29, 2005, was

negative, and the treating physician did not "detect any reflex asymmetry, pathological reflexes, sensory disturbances or strength problems." Tr. 224. A brief neurological exam produced normal results, and the treating doctor, Dr. Michael D. Heafner, Sr., M.D., recommended conservative measures to plaintiff and the possibility of surgery (L5-S1 microdiscectomy) if she continued to experience a lot of pain. Tr. 224-25.

Plaintiff's symptoms did not improve pursuant to conservative measures, and she required pain medications. Tr. 221. On October 18, 2005, Dr. E. Hunter Dyer, M.D., Carolina Neurosurgery & Spine, noted that the pain was starting to limit plaintiff's activity significantly. Tr. 221. Dr. Dyer recommended the L5-S1 microdiscectomy and not treating the L4-5 abnormality. Tr. 221. On October 28, 2005, plaintiff underwent the right side L5-S1 microdiscectomy for a herniated disc. Tr. 229-30.

On November 14, 2005, plaintiff called Carolina Neurosurgery & Spine, complaining of post-operative pain. Tr. 282. She reported tightness in her legs, and she felt that the strength had not yet returned in her legs. Plaintiff stated that she was "doing well otherwise," and her incision looked normal. Tr. 282. The registered nurse taking plaintiff's call discussed a stretching and strengthening book and encouraged plaintiff to start walking. Tr. 282.

On November 17, 2005, plaintiff met with Dr. Dyer, who reported that plaintiff "has done remarkably well. She has had complete resolution of back and leg pain. She is very happy with her progress." Tr. 280. The surgery incision had healed well, and plaintiff was found to have "excellent strength throughout her lower extremities." Tr. 280. Dr. Dyer discussed increasing plaintiff's activities over time. Tr. 280. On

December 9, 2005, plaintiff called Carolina Neurosurgery & Spine, complaining of having pain and numbness in her right leg again. Tr. 279. She told the representative taking the call that she had been walking on hard floors and sleeping in a different bed recently. Tr. 279. On January 10, 2006, plaintiff had an appointment with Dr. Dyer, who reported that she was doing well following surgery, with some stiffness, and a little bit of occasional right buttock pain. Tr. 278. Dr. Dyer noted that overall, plaintiff and her leg were "much improved." Tr. 278. Plaintiff had a negative straight leg raise, and she and Dr. Dyer discussed physical therapy. Tr. 278. On April 17, 2006, plaintiff called Dr. Dyer's office, complaining of back and right leg pain. Tr. 277. Dr. Dyer prescribed a Medrol Dosepak. Tr. 277.

On January 31, 2006, Dr. Earl J. Epps, Jr., M.D., North Carolina Department of Health and Human Services, Disability Determination Services, conducted an evaluation of plaintiff. Tr. 240-44. Plaintiff's chief complaints to Dr. Epps were fibromyalgia, chronic pain syndrome, degenerative disc disease, and depression. She told Dr. Epps that she was originally diagnosed with fibromyalgia in December 2000 by a rheumatologist, who also diagnosed plaintiff as having chronic fatigue syndrome. Tr. 240. She complained of musculoskeletal pain affecting her ability to perform daily activities, and she stated that her primary care physician (Dr. Ayers) was treating her fibromyalgia and chronic pain syndrome. Tr. 240. She said that she began experiencing back pain in September 2005; however, she never had any history of trauma to her back. Tr. 240. She informed Dr. Epps that she had a microdiscectomy in October 2005, but she continued to have chronic lower back pain, along with pain and numbness radiating down her right

leg. Tr. 240. Plaintiff stated that the combination of her lower back pain and right lower extremity radiculopathy, coupled with her fibromyalgia and chronic pain syndrome made it difficult to move around and perform daily activities. Tr. 240-41. She stated that "she cannot stand or sit for long periods of time, walk long distances or lift heavy objects." Tr. 241. Plaintiff told Dr. Epps that she was first diagnosed with depression in 1998 by her primary care physician. She had seen a therapist, but she had never had a psychiatric evaluation or been hospitalized for mental illness. Tr. 241. She received antidepressant medications from her primary care physician. Tr. 241.

At the time of the evaluation, plaintiff was taking the prescription medications Wellbutrin, Cymbalta, Ambien, and Klonopin. Tr. 241. The physical examination conducted by Dr. Epps revealed that plaintiff was "able to get on and off the examination table and dress and undress herself without assistance and requires no assistive devices for ambulation." Tr. 241. All of plaintiff's vital signs were within normal ranges, and Dr. Epps found that her cranial nerves II-XII were "grossly intact," and there was "no loss of motor, sensory, or coordination function." Tr. 242. An examination of plaintiff's extremities revealed no evidence of edema, ulcerations, variscosities, joint swelling, or erythema. "The patient can forwardly flex the cervical spine 40 degrees, rotation to the right and left is 70 degrees. She can forwardly flex the thoracolumbar spine 80 degrees and rotate to the right and left 20 degrees." Tr. 242. Plaintiff had normal ranges of motion and muscle strength in her upper extremities. Tr. 242. Dr. Epps found that plaintiff had normal range of motion in both hips; she could flex her right knee 110 degrees and her left 120 degrees; she had normal range of motion in her ankles and had

muscle strength estimated at 5/5 in her right and left lower extremities. Tr. 242. Plaintiff's gait was normal, and a straight leg raise test was negative for both legs. Tr. 242. Regarding her mental condition, Dr. Epps noted that plaintiff behaved appropriately during the examination. Tr. 242. Dr. Epps also noted that plaintiff was able to move around the examination room "without major difficulty, although she did complain of pain in the lower back as well as in the right lower extremity with movement." Tr. 243. Plaintiff stated that she was taking over-the-counter medication for her pain. Tr. 243.

On February 16, 2006, plaintiff met with Dr. Carol M. Gibbs, M.D., North Carolina Department of Health and Human Services, Disability Determination Services, for a psychiatric evaluation. Tr. 245-47. Plaintiff drove herself to the evaluation, was neatly dressed, and "[h]er gait was slow and somewhat antalgic." Tr. 245. Her thought process was "goal-directed and organized," and Dr. Gibbs found her to be within the average range of intellectual functioning. Tr. 245. Plaintiff told Dr. Gibbs that she has been depressed since 1998, complained of low energy and fatigue, stated that she lacks motivation, and is frequently irritable. She said that she sometimes feels withdrawn from people but feels as though she does not isolate herself. Tr. 245. She complained of insomnia and said she gets frustrated because she cannot do the things she wants to do. Tr. 245. She does not have panic attacks but feels anxious when she has to pay bills or change her lifestyle. Tr. 245. She has never felt suicidal, and she was not currently seeing a mental health professional when she met with Dr. Gibbs. She last met with a licensed clinical social worker in 1998, and she had five visits with that individual. Tr. 245.

Plaintiff stated that she does very little during the day if she does not sleep well or hurts a lot.  Tr. 246.  She stated that she reads the paper and watches television, takes a nap in the afternoon, and goes grocery shopping if "she feels up to it."  Tr. 246.  She said that she watches television at night.  She has friends in North Carolina, as well as Charleston.  She said that she likes to container garden, swim, and she drives.  Tr. 246.  Dr. Gibbs determined that plaintiff was "alert and oriented to person, place, time, and situation."  Tr. 246.  Dr. Gibbs diagnosed plaintiff with depressive disorder secondary to chronic medical condition on AXIS I, none on AXIS II, and degenerative disc disease, fibromyalgia, obesity, GERD, carpal tunnel syndrome, tendonitis, and sinusitis on AXIS III.  Tr. 246.  Dr. Gibbs found that

> [w]ithin a work setting, this claimant should be able of [sic] understanding simple and even complex instructions.  Her ability to respond to work-related pressures would be mildly impaired.  Her ability to deal effectively with others on a consistent basis would be mildly impaired.  Sustained persistence would likely be problematic primarily given her physical limitations.

Tr. 246.  Dr. Gibbs also determined that plaintiff was capable of managing her own funds. Tr. 246.

On April 21, 2006, Dr. Ayers treated plaintiff for a fibromyalgia flare-up. Plaintiff told Dr. Ayers that she experienced lower back pain, and that her weight was up approximately twenty pounds.  Tr. 291.  All of her vital signs and extremities observations were normal.  Dr. Ayers assessed plaintiff with a fibromyalgia flare-up, worsening obesity, and a history of recent back surgery.  Tr. 291.  Dr. Ayers increased plaintiff's dose of Cymbalta and prescribed Celebrex.  In addition, Dr. Ayers instructed plaintiff to follow up with Dr. Dyer to address her back issues, and to see Dr. Ayers again

in three weeks for a re-check.  Tr. 291.

On May 16, 2006, plaintiff had her re-check with Dr. Ayers.  She stated that she felt better, overall, during the previous week on the increased dose of Cymbalta, with a slightly increased energy level and slightly improved moods.  Tr. 284.  She also stated that her back pain was slightly less than during her April appointment.  Plaintiff did not have insurance, and Dr. Ayers discussed the Physician Reach Out program with plaintiff. Tr. 284.  Plaintiff reported that her fibromyalgia was very sporadic, and she had good days and bad days.  Dr. Ayers acknowledged that it would be difficult to get plaintiff back into physical therapy for fibromyalgia because she had no insurance.  Tr. 284.  Plaintiff's physical examination revealed no abnormalities.  Dr. Ayers reported that plaintiff's fibromyalgia was under "suboptimal control," and she increased plaintiff's Cymbalta and would like to get her back into physical therapy.  Tr. 284.  Dr. Ayers reported that plaintiff could consider increasing her dose of Wellbutrin, and that she needed a sleep reevaluation, but it was unlikely that she could afford it without insurance.  Tr. 284.  Dr. Ayers noted that plaintiff still suffered from obesity and GERD, but her history of insomnia was stable.  Tr. 284.

On August 23, 2007, plaintiff had an appointment with Dr. Georgia C. Roane, M.D., Rheumatology Associates, P.A., in Charleston, South Carolina.  Tr. 329-30. Plaintiff told Dr. Roane that she was diagnosed with fibromyalgia in 2000 and that she has had generalized pain for a number of years.  She told Dr. Roane that "she aches everywhere, and she specifically name[d] the joints which include the wrists, hands, shoulders, ankles, knees and hips.  She also note[d] some muscle aching."  Tr. 329.

Plaintiff complained of swelling in the wrists, hands, and knees. She stated that she is stiff and suffers from pain in the mornings. These feelings improved by midday, but they worsened again later in the day. Tr. 329. She stated that she did not find any relief in prescription medications, but she sometimes used Advil. Tr. 329.

Dr. Roane's physical examination concluded that she had stable vital signs, tender wrists, non-tender metacarpophalangeal (MCP) joints and distal interphalangeal (DIP) joints. Tr. 329. Her elbows moved normally with tenderness, and "[b]oth shoulders were tender with abduction to 90 degrees." Tr. 329. Plaintiff's ankles were tender, and her second and third metatarsophalangeal (MTP) joints were tender. Plaintiff's fourth and fifth toes were wrapped due to a recent injury, and her "knees were cool without synovitis or effusions." Tr. 329. Her lungs, cardiac exam, thyroid, and abdomen were all normal. Tr. 329. An x-ray of plaintiff's right foot showed no fracture of the fourth and fifth toes; Dr. Roane noted that the "fifth distal phalanx was deviated slightly medially, but no other significant abnormality was seen." Tr. 329. Dr. Roane's impression was that plaintiff had,

> longstanding fibromyalgia. However she has a significant amount of joint pain and tenderness and in addition has been helped dramatically by a trial of steroids in the recent past. I'm therefore concerned about the possibility of early rheumatoid arthritis, and we will simply have to follow her a bit longer over time to sort things out.

Tr. 329-30.

Plaintiff met with Dr. Roane again on October 9, 2007, at which time she reported significantly more joint pain. Tr. 328. Dr. Roane determined that her wrists, MCP joints, and proximal interphalangeal (PIP) joints were mildly tender, and her shoulders were

"quite tender" with abduction. Tr. 328. Her knees did not show any effusions or synovitis, but both were tender. Plaintiff's MCP joints and ankles had prominent tenderness. Her lungs and cardiac exam were normal. Tr. 328. Dr. Roane determined that plaintiff's symptoms were suggestive of serongative rheumatoid arthritis, and she prescribed a trial of Prednisone. Tr. 328.

On November 8, 2007, plaintiff met with Dr. Roane. Tr. 327. Plaintiff's arthritic symptoms had improved with Prednisone at twenty milligrams, but it had side effects, so she stopped using the drug briefly. After reporting pain and stiffness in her joints, Dr. Roane prescribed Plaquenil, in addition to continuing Prednisone at ten milligrams. Tr. 327. On December 5, 2007, after being in a car accident, plaintiff experienced neck and upper back pain and met with Dr. Roane. Tr. 326. Plaintiff's lower back was not bothering her. Dr. Roane reported that the Plaquenil had been "very helpful" in treating the rheumatoid arthritis, and her symptoms were "pretty well controlled." Tr. 326. Plaintiff's neck had a full range of motion. Her shoulders moved normally, were non-tender and had normal strength, but there was soft tissue pain in the neck and upper back. Tr. 326. Her lungs and heart function were normal. Her "hands and wrists revealed no visible synovitis," and her wrists moved well without significant tenderness. Tr. 326. Dr. Roane reported that plaintiff's serongative rheumatoid arthritis was under "good control." Tr. 326. She discontinued use of Prednisone and diagnosed plaintiff with a mild case of whiplash caused by the automobile accident. Tr. 326.

On January 16, 2008, plaintiff testified before the ALJ in Charleston, South Carolina. Tr. 24-42. She testified that she had arthritis and degenerative disc disease,

and that she had difficulty grasping items because she lacked control of her hands. Tr. 28. She stated that she would have difficulty in removing a jug of milk from the refrigerator and immediately returning it. Tr. 28-29. She stated that she could do repetitive, or back and forth, motions with her hands, as long as she did not have to reach for an object. Tr. 29. She added that she experienced pain in her feet and ankles. Tr. 29. Plaintiff said that does not walk outside of her home, and it would be difficult for her to walk several blocks. Tr. 29. She said that she has difficulty negotiating stairs, particularly walking down stairs. Tr. 30. She stated that she does not perform housework, and the last time she held a job, she missed approximately three to five days a month because she would become exhausted. Tr. 30-31.

Plaintiff testified that she has difficulty sleeping because of her pain. Tr. 31. She gets up early in the morning, eats and takes her medicine, and spends a significant amount of time on the sofa. Tr. 31-32. She then takes a nap every afternoon. Tr. 32. Plaintiff testified that the back surgery she underwent did not fix all of her back problems. She still experienced some back pain, along with numbness and pain in her right leg. Tr. 32-33. She stated that she takes the prescription medications Cymbalta, Wellbutrin, Plaquenil, Mobic, Klonopin, and Flexeril. Tr. 33.

Plaintiff told the ALJ that her pain is worse when she is active, and when it is cold or damp. Tr. 35. She testified that she experiences pain when she lies down, and when she squats down. Tr. 35. She testified that she no longer swims and gardens, but she shops for groceries approximately once a week, and she drives when she needs to do so. Tr. 35-36. Plaintiff stated that she very rarely cooks because she does not have much

energy, and it is difficult for her to grip items with her hands.  Tr. 36.  She stated that

taking Plaquenil and Prednisone helped her arthritis for a couple of months, but the

Plaquenil was not helping as much anymore, and the Prednisone made her feel "shaky."

Tr. 37.

Dr. Arthur Schmidt, vocational expert, also testified at the hearing.  The ALJ

asked Dr. Schmidt if a person of plaintiff's age, education, and background, "limited to

light unskilled work not requiring frequent public interaction, not involving work at

heights or around dangerous, moving machinery, not requiring more than occasional

stooping, kneeling, crouching, crawling, squatting, bending" could perform jobs available

in the national economy.  Tr. 39.  Dr. Schmidt identified the jobs of Tobacco Sampler,

Bench Assembly, and Carton Packer.  Tr. 39.  Dr. Schmidt testified that the jobs of

Tobacco Sampler and Carton Packer allow for sitting and standing, and the job of Ticket

Taker could substitute for bench assembly.  Tr. 40.  Dr. Schmidt stated that if plaintiff

could not continuously grip or handle items, or use foot or arm controls or reach, she

could still perform the jobs of Carton Packer or Ticket Taker.  Tr. 40.  The ALJ asked Dr.

Schmidt if a person with a "moderate to moderately [severe] limitation to the ability to

maintain persistence and pace so that the deficit to work performance is at greater than

20%, would the jobs you testified to or any jobs in the national economy be available to

such a person?"  Tr. 40.  Dr. Schmidt replied in the negative.  Tr. 40.  When asked by

counsel, Dr. Schmidt testified that introducing the inability to stoop, kneel, crouch, crawl,

or bend, would not interfere with the possible available jobs identified by Dr. Schmidt.

Tr. 41.  In addition, counsel asked if an individual had to miss three or four days per

month because of that person's limitations, would it eliminate any of the jobs identified by Dr. Schmidt.  Tr. 41.  Dr. Schmidt stated that it would eliminate all jobs in the national economy.  Tr. 41.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140 (1985).  This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected.  See id. at 149-50.  A party's general objections are not sufficient to challenge a magistrate judge's findings.  Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir. 1991).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court.  Mathews v. Weber, 423 U.S. 261, 270 (1976).  This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration.  28 U.S.C. § 636 (b)(1).

Although this court may review the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" has been defined as,

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

### III. DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520, 416.920. Under this process, the ALJ must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether that severe impairment meets or equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without

considering vocational factors; (4) if not, whether the impairment prevents him or her

from performing past relevant work; and (5) if so, whether the claimant is able to perform

other work considering both his remaining physical and mental capacities (defined as

Residual Functional Capacity or "RFC") and his vocational capabilities (age, education,

and past work experience) to adjust to a new job.  Hall v. Harris, 658 F.2d 260, 264-65

(4th Cir. 1981); see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20

C.F.R. § 416.920).  The applicant bears the burden of production and proof during the

first four steps of the inquiry.  Pass, 65 F.3d at 1203 (citing Hunter v. Sullivan, 993 F.2d

31, 35 (4th Cir. 1992)).  If the sequential evaluation process proceeds to the fifth step, the

burden shifts to the Commissioner to show that other work is available in the national

economy that the claimant could perform.  Id.; see also Bowen v. Yuckert, 482 U.S. 137,

146 n.5 (1987) (discussing burden of proof).

In the case before the court, the ALJ found that plaintiff suffers from several

severe impairments (fibromyalgia, arthritis, and depression); however, she does not have

an impairment or combination of impairments that meets or medically equals one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 12.  The ALJ

determined that plaintiff has the residual functional capacity to make a successful

adjustment to other work that exists in significant numbers in the national economy.  Tr.

19.  Therefore, the ALJ held that plaintiff is not entitled to DIB.  Tr. 19-20.

## A.  Severity of Impairments

Plaintiff argues that she suffers from the severe impairments of degenerative disc

disease, sciatica, radiculopathy, and neuropathy, and the ALJ's findings and plaintiff's

medical history do not support the conclusion that these impairments failed to satisfy the durational requirement. Pl.'s Objections 1. Plaintiff argues that her sciatica, radiculopathy and neuropathy were not resolved by the 2005 back surgery, and they remained unresolved at the time of the hearing.

A severe impairment or combination of impairments "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Conversely, a non-severe impairment, or combination of impairments, is one that does not significant limit an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ must determine at step two of the five-step sequential evaluation process if a claimant has a severe impairment or combination of impairments; however, it is the claimant's burden at step two to show "that he has a medically severe impairment or combination of impairments." Bowen, 482 U.S. at 146 n.5.

Section 404.1520(a)(4)(ii) also makes clear that, in addition to severity, a claimant's alleged impairment or combination of impairments must meet the durational requirement found in § 404.1509. That subsection states, "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. § 404.1509.

The December 2004 medical record documenting plaintiff's appointment with Dr. Ayers indicates that plaintiff experienced back pain and pain radiating down to her right knee; however, it also states that she had full range of motion in her back. Tr. 214. Plaintiff also reported feeling better and have no real complaints during visits with Dr.

Ayers in January, June, and August 2005. Tr. 209, 210, 212.[2]

In August 2005, plaintiff met with doctors at OrthoCarolina, who found that plaintiff's gait was "mildly antalgic," and that plaintiff's hip and spine range of motion were "good without significant discomfort." Tr. 186. In September 2005, plaintiff complained of pain in her lower back and hamstring. Tr. 207. The medical report of that visit with Dr. Ayers noted that plaintiff "had been doing some heavy lifting and water skiing, had driven also from Charleston back and forth and had pain associated with this." Tr. 207. An MRI conducted that same month showed that plaintiff suffered from degenerative disc disease, and that she had a herniated disc. Tr. 204. In a September 2005 medical report from OrthoCarolina, Dr. Ternes noted that plaintiff had no prior history of any pain or discomfort similar to her recent posterior right thigh pain. Tr. 184. Dr. Ternes noted some tenderness upon touching plaintiff's right sciatic notch, and he assessed that plaintiff suffered from right sciatica. Tr. 185. On September 29, 2005, plaintiff reported to Carolina Neurosurgery & Spine that she did not have much back pain, but she did experience right buttock and posterior thigh pain. Tr. 223.

During the period of September to October 2005, plaintiff underwent physical therapy, but she apparently only received temporary pain relief in her right buttock and thigh as a result. Tr. 187. After undergoing a right side L5-S1 microdiscectomy on October 28, 2005, plaintiff's condition improved, according to the medical reports. On November 17, 2005, plaintiff met with Dr. Dyer, who reported that plaintiff was doing

---

[2]Plaintiff did complain of rib and ankle pain in May 2005; however, her pain in that instance resulted from a fall. Tr. 211.

"remarkably well.  She has had complete resolution of back and leg pain.  She is very happy with her progress."  Tr. 280.  Dr. Dyer also found that plaintiff had "excellent strength throughout her lower extremities."  Tr. 280.

On January 31, 2006, Dr. Epps examined plaintiff, who said she had lower back pain, and pain and numbness radiating down her right leg.  Tr. 240.  Dr. Epps noted that plaintiff was able to get on and off the examination table and dress and undress herself without assistance, and her extremities revealed no evidence of edema, ulcerations, variscosities, joint swelling, or erythema.  Tr. 242.  Plaintiff had normal ranges of motion and muscle strength in her upper extremities.  Her gait was normal and a straight leg test was negative for both legs.  Tr. 242.  She moved around the examination room "without major difficulty," although she did complain of lower back pain and pain in the lower right extremity.  Tr. 243.  Plaintiff stated that she took over-the-counter medication for pain.

In May 2006, plaintiff told Dr. Ayers that her back pain was slightly less than during the month before.  Tr. 284.  The remainder of plaintiff's medical records address her fibromyalgia flare-ups and a diagnosis for rheumatoid arthritis.  The magistrate judge's report is correct that the remaining medical records do not reveal diagnoses of sciatica, radiculopathy, or neuropathy.   None of the medical records provided by plaintiff indicate that the alleged impairments of sciatica, radiculopathy, or neuropathy lasted continuously for at least twelve months.  And while plaintiff may have experienced some pain in her lower back and right leg as a result of degenerative disc disease following her back surgery in 2005, the medical records do not show that she suffered a severe

impairment that was continuous for a period of at least twelve months. The severity of her degenerative disc disease, as chronicled in the medical reports, has varied over time, and, as acknowledged in plaintiff's objections, plaintiff's symptoms were intermittent. Pl.'s Objections 4. Accordingly, this court finds that substantial evidence supports the ALJ's determination that plaintiff's degenerative disc disease, sciatica, radiculopathy, and neuropathy were not severe impairments pursuant to 20 C.F.R. § 404.1520(c).

## B. Listing Analysis

Plaintiff argues that the ALJ never performed a proper listing analysis of Listing 14.09 for plaintiff's rheumatoid arthritis impairment, even if she was justified in dismissing a treating physician's opinion at another step in the sequential evaluation process. An impairment "meets the requirements of a listing when it satisfies all of the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). "If your impairment(s) does not meet the criteria of a listing, it can medically equal the criteria of a listing" pursuant to 20 C.F.R. § 404.1526. Specifically, with regard to plaintiff's rheumatoid arthritis, the ALJ identified the requirements for Listing 14.09: "a history of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively." Tr. 17 (referencing 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09A).

"While Appendix 1 must be considered in making a disability determination, it is not required that the Secretary mechanically recite the evidence leading to her determination." Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986). "An ALJ's

findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005).

Although Dr. Roane expressed the opinion that plaintiff's rheumatoid arthritis impairment met the requirements of Listing 14.09 on November 13, 2007, this court agrees with the ALJ's determination that this opinion is inconsistent with the findings in plaintiff's medical records. In December 2007, Dr. Roane reported that the use of Plaquenil had been "very helpful" in treating plaintiff's rheumatoid arthritis, and her symptoms were "pretty well controlled." Tr. 326. At that time, plaintiff's neck had full range of motion; her shoulders moved normally and were non-tender; her wrists moved well without significant tenderness; and Dr. Roane described plaintiff's arthritis as being under "good control." Tr. 326. The magistrate judge and ALJ also correctly point out that "there was no showing in the documentary evidence that Plaintiff had either an inability to effectively ambulate or perform fine and gross movements with her upper extremities." Report & Recommendation 10. Moreover, Dr. Epps, the consultative examiner, found that plaintiff could effectively ambulate without assistance, and that she had normal ranges of motion and muscle strength in her upper extremities. Tr. 242. The ALJ's determination that plaintiff's rheumatoid arthritis impairment failed to meet the requirements of Listing 14.09 is supported by substantial evidence.

### C. Combination of Impairments

Plaintiff's third objection to the magistrate judge's report and recommendation is that the ALJ did not conduct a proper combination of impairments analysis pursuant to

the Fourth Circuit's holding in Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989).  In the alternative, plaintiff argues that the ALJ failed to conduct a proper medical equivalence analysis for plaintiff's combination of impairments.

Title 20 C.F.R. § 404.1523 sets forth the requirement of considering multiple, or a combination of, impairments to determine whether a claimant is disabled:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

Title 20 C.F.R. § 404.1526(a) states that an impairment is "medically equivalent to a listed in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment."

The magistrate judge correctly stated that "[i]n evaluating a claim for disability insurance benefits, the Commissioner is required to consider the combined effects of a claimant's impairments, and he must adequately explain his evaluation of the combined effect of those impairments."  Report & Recommendation 10 (citing Walker, 889 F.2d at 50; Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989); Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985)).  The magistrate judge also acknowledged the general requirement that "an ALJ explicitly indicate the weight given to all relevant evidence."  Report & Recommendation 10 (citing Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987)). Separate consideration of a claimant's physical impairments, complaints of pain, and

daily activity levels is sufficient to determine whether a claimant has a disabling combination of impairments. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). "'To require a more elaborate articulation of the ALJ's thought processes would not be reasonable.'" Id. (quoting Gooch v. Sec'y of Health & Human Servs., 833 F.2d 589, 592 (6th Cir. 1987)).

The ALJ discussed each of plaintiff's alleged impairments, her courses of treatment, and all available medical records in detail in her decision. Tr. 12-18. The ALJ found that,

> [a]fter considering the evidence of the record, I find that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

Tr. 17. The ALJ then explained that Dr. Ayers's October 2004 opinion that plaintiff would not be successful in attempting to go back to work stood in contrast to the treatment records for plaintiff through April 2006, which presented examination findings that were "relatively benign." Tr. 17. The ALJ also gave little weight to the November 13, 2007 opinion of Dr. Roane, in which Dr. Roane found that plaintiff's rheumatoid arthritis met Listing 14.09, because her opinion was not supported by her physical findings in the treatment records. Tr. 17. The ALJ then found:

> Claimant takes no prescription medications for pain. She also reported doing a variety of daily activities to several doctors; yet testified to hardly any. I carefully considered claimant's medically determinable impairment of depression, and I find that limiting her to unskilled work not requiring frequent interaction with the public satisfies the limitations she has from it, looking at the evidence in a light most favorable to the claimant. She was

placed on anti-depressants, anti-anxiety medicine, and sleep medicine for her fibromyalgia and these medications keep it under control, except for occasional flares.

Pursuant to Social Security Ruling 96-6p, 20 CFR 404.1527(f), and 416.927(f), I have considered the findings of fact and opinions made by State Agency medical consultants and other program physicians regarding the nature and severity of the claimant's impairments. I have also given their findings significant weight to the extent their opinions are consistent with the record when considered in its entirety.

Tr. 18. In addition, the ALJ took into account plaintiff's alleged impairments when posing hypotheticals to Dr. Schmidt, the vocational expert. Tr. 38-41.

The ALJ squarely addressed the issue of whether plaintiff had a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 12. The ALJ identified plaintiff's impairments of arthritis, fibromyalgia, and depression, and she provided explanations as to why each of these impairments failed to meet or equal a listed impairment. Tr. 12. Substantial evidence supports the ALJ's findings regarding plaintiff's impairments in light of the requirements for both considering a combination of impairments pursuant to Walker and pursuant to medical equivalence under step three of the sequential evaluation process.

### D. Treating Physicians' Opinion

Plaintiff's final objection is that the ALJ's rejection of plaintiff's treating physicians' opinions was not supported by substantial evidence. Plaintiff argues that plaintiff's medical conditions have intermittent symptoms; therefore, the entire record must be considered as a whole. Plaintiff argues that "on the whole," plaintiff's impairments were "prolonged, serious, and unresolved." Pl.'s Objections 5.

30

Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527 (2005)). Opinions of treating physicians occupy a special status. "[T]he treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam); see also Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987) ("[The treating physician] rule requires that the opinion of a claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence."); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983) (same). "A treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing 20 C.F.R. § 416.927). "Thus, '[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'" Id. (citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)). "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Id. (citing Hunter, 993 F.2d at 35).

Social Security Ruling 96-2p deals with giving controlling weight to treating source medical opinions and provides,

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The ruling goes on to explain that,

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision:

* is not fully favorable, e.g., is a denial; or

* is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

> *the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. . . .*

(emphasis added).

In October 2004, Dr. Ayers reported that going back to work was "not really an option" for plaintiff. Tr. 219. The ALJ gave "little weight" to this opinion because this physican's examination findings were "relatively benign." Tr. 17. This determination by the ALJ was adequately supported by the following medical records: (1) In December 2004, Dr. Ayers's physical examination of plaintiff reflected normal results, with the exception of tenderness in plaintiff's lower lumbar spine (Tr. 214); (2) In January 2005, Dr. Ayers reported that plaintiff's depression had improved significantly (Tr. 213); (3) In March, June, and August 2005, plaintiff was doing well, overall, and had no complaints (Tr. 209, 210, 212); (4) In September 2005, plaintiff reported that she had been doing heavy lifting, water skiing, and driving back and forth between Charlotte and Charleston (Tr. 207); (5) Dr. Ayers found that plaintiff's fibromyalgia was "well-controlled on Cymbalta" (Tr. 199); (6) Following her back surgery in October 2005, plaintiff met with Dr. Ayers in April 2006, at which time her physical examination was once again within normal limits (Tr. 291); and (7) In May 2006, plaintiff told Dr. Ayers that she was feeling better (Tr. 284).

The other treating physician's opinion given little weight by the ALJ was Dr. Roane's November 13, 2007 determination that plaintiff's rheumatoid arthritis impairment meets Listing 14.09. As determined by this court above, Dr. Roane's

33

determination was inconsistent with subsequent medical records, in which Dr. Roane reported that plaintiff's rheumatoid arthritis was under "good control." Tr. 326-27.

In addition to the two treating physcians above, plaintiff also makes reference to findings by a state agency consultant, who allegedly opined that plaintiff had "severe limitations." Pl.'s Objections 5. A state agency consultant is not a treating physician, and plaintiff fails to identify a specific agency consultant. Upon review of the record, this court was unable to find any opinions by a state agency consultant indicating that plaintiff had "severe limitations." This court finds that the ALJ's determinations regarding plaintiff's treating physicians' opinions were supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the court **ADOPTS** the magistrate judge's report and recommendation and **AFFIRMS** the Commissioner's decision denying benefits.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

September 17, 2010
Charleston, South Carolina

34